30

(No. 386,558-A — Decided
December 15, 1988.)

Probate Court of
Franklin County.

*Robert A. Pope,* for David Alexander, Administrator.

*H.L. Thompson,* for Eleanor Summers Kenney et al.

*Fred E. Sams,* for Union Cemetery Association, Inc.

Richard B. Metcalf, J.  On July 13, 1988, David Alexander was appointed the Administrator of the Estate of David Summers, deceased; and, subsequently, Alexander filed a petition to determine heirship. The petition indicates that David Alexander is the son of David Summers, deceased, and that Alexander is the sole heir at law of Summers. The decedent, David Summers, died destitute, but now his estate is subject to a considerable inheritance from the estate of his uncle, Alfred A. Adams, which estate is currently being administered in the Circuit Court of Cook County, Illinois.

On July 26, 1988, David Alexander, as the Administrator of David Summers' Estate, requested the named defendants to sign an application for disinterment of the body of the deceased, David Summers, for the purpose of conducting a genetic test, namely a DNA (deoxyribonucleic acid) test, to establish the paternity between the decedent, David Summers, and David Alexander. After all defendants refused to sign the application for disinterment, Alexander motioned the court for an order to compel discovery. On August 22, 1988, the Union Cemetery Association, Inc. motioned the court to join the action as a party-defendant; the motion was granted on September 30, 1988. Meanwhile, on September 26, 1988, the defendant family members motioned to dismiss the action. On October 21, 1988, the defendants filed a motion requesting the court for a protective order. Finally, on November 10, 1988, the court overruled the defendants' motion to dismiss and, after a hearing four days later, the court also overruled the motion for a protective order and ordered defendant Union Cemetery Association to exhume the remains of David Summers, deceased. It is this order of the probate court on which the defendants are now appealing.

This court views this matter as a case of first impression. After taking judicial notice of the accuracy of the DNA test, the court recognizes that the problems of proof inherent to an action in which paternity is alleged should no longer deprive an illegitimate child of proving his paternity. Defendants argue that Alexander should not be given the opportunity to prove that he is the natural son of the decedent, David Summers, because Alexander failed to initiate a parentage action pursuant to R.C. Chapter

3111 within the applicable statute of limitations, R.C. 3111.05. However, the court does not find this argument persuasive because at the death of David Summers there was no reason for Alexander to establish paternity because there was no benefit to him. Now that the benefit of the inheritance from the Estate of Alfred A. Adams has accrued in the Estate of David Summers, the defendants wish to cut the decedent's son off and deprive him of his father's share. This court recognizes that the legal rights of illegitimate children, especially the right of inheritance, is a developing area of the law, and history bears this out.

Historically, both the English common law and society itself perceived illegitimate children to be a disgrace, a stigma, and labeled this class with the title of "bastards." Through no fault of his own, the bastard was a social outcast. The bastard was the product of an illicit, immoral, and promiscuous relationship. Because the child was not conceived within the legal constraints of marriage, the child could not enjoy the legal rights, liberties, and benefits of a child who was in fact conceived within the bond of marriage. The right of an illegitimate child to inherit was nonexistent. Blackstone, in his Commentaries on the Laws of England, at 459, states that "* * * [t]he incapacity of a bastard consists principally in this, that he can not be heir to any one, neither can he have heirs, but of his own body; for, being *nullius filius,* he is therefore of kin to nobody, and has no ancestor from whom any inheritable blood can be derived. * * *" This status continued in the common law and was eventually carried over to the United States.

An exception to this rule in the common law was found in the state of Connecticut. The common-law rule of *nullius filius* was repudiated early in Connecticut case law. In the case of *Heath* v. *White* (1824), 5 Conn. 228, the court held that an illegitimate child may inherit from his mother, stating that the English law of descents had never been admitted in that state. This 1824 holding affirmed the earlier holding in *Brown* v. *Dye* (1795), 2 Root (Conn.) 280, 281, which stated that, "* * * [t]he common law of England, which has been urged in this case, is not to be mentioned as an authority in opposition, to the positive laws of our own state; and nothing can be more unjust than that the innocent offspring should be punished for the crimes of their parents, by being deprived of their right of inheriting by the mother, when there doth not exist amongst men a relation so near and certain, as that of mother and child."

Connecticut's progressive treatment of an illegitimate child's right of inheritance led the way to repeal the common-law rule. By the late 1800s to the early 1900s most states had abrogated the common-law rule by either statute or case law. This matter was best summed up by the conclusions of the Illinois Supreme Court in *Morrow* v. *Morrow* (1919), 289 Ill. 135, 138-139, 124 N.E. 386, 387, which stated that "the tendency of the legislation in this State upon this subject shows an intention upon the part of the legislature to remove the rigors of the common law and to establish a rule of descent with reference to illegitimates consonant with the finer sense of justice and right and not to visit the sins of the parents upon the unoffending offspring. * * *" Thus, in a historical context, by the early 1900s it was well established in the law that an illegitimate child had the right to inherit from his mother.

The rights of inheritance of an illegitimate child continued to develop as the law steered in the direction of establishing inheritance rights to the alleged father. It was immediately rec-

ognized that the task of establishing paternity with the father was all but insurmountable for the illegitimate child; therefore, most case law, as well as statutes, provided that inheritance by an illegitimate child from his father could only be effected if the father publicly acknowledged that he was in fact the father of the illegitimate child. In some jurisdictions this "acknowledgement" had to be in a notarized writing, while other jurisdictions only required the "acknowledgement" to be open and notorious. Nevertheless, it was only by some affirmative act by the father that this "acknowledgement" could be established. Therefore, despite the progressive development of rights for illegitimate children, the law still divided children into two distinct classes: legitimate or illegitimate.

With this definite class distinction, the United States Supreme Court took up the issue in 1968 on the basis of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. In *Levy* v. *Louisiana* (1968), 391 U.S. 68, the Supreme Court considered whether a wrongful death action can be brought by illegitimate children for the death of their mother. The lower court held that the applicable Louisiana statute allowed a child to commence the action, but only if that child was legitimate. The Supreme Court struck down the Louisiana statute stating that the statute, as construed, resulted in an invidious classification. At that time, it almost appeared that the Supreme Court had classified illegitimate children as a suspect class, thus invoking strict scrutiny in reviewing all laws that affect the rights of that class.

In 1971, the Supreme Court decided *Labine* v. *Vincent* (1971), 401 U.S. 532. The decision in that case was somewhat surprising because it appeared to be directly at odds with the *Levy* decision. The case involved an illegitimate child seeking to inherit equal shares with collateral relatives of the father in his estate. Unfortunately for the illegitimate child, the court did not detect or construe any suspect classification in this case. The Supreme Court was content with simply deferring to the state legislature's prerogative to regulate the disposition of the decedent's property.

It appeared that the Supreme Court was charting a rather zig-zag course, for in 1972 the court made a dramatic departure from *Labine* in the case of *Weber* v. *Aetna Casualty & Surety Co.* (1972), 406 U.S. 164. In this case, the Louisiana workers' compensation statute was attacked by illegitimate children because the statute denied benefits to children who were not legitimate. The Supreme Court stated:

"The status of illegitimacy has expressed through the ages society's condemnation of irresponsible liaisons beyond the bonds of marriage. But visiting this condemnation on the head of an infant is illogical and unjust. Moreover, imposing disabilities on the illegitimate child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing. Obviously, no child is responsible for his birth and penalizing the illegitimate child is an ineffectual — as well as an unjust — way of deterring the parent. Courts are powerless to prevent the social opprobrium suffered by these hapless children, but the Equal Protection Clause does enable us to strike down discriminatory laws relating to status of birth where — as in this case — the classification is justified by no legitimate state interest, compelling or otherwise." (Footnotes omitted.) 406 U.S. at 175-176.

Thus, the court concluded that the illegitimate child should not have been denied workers' compensation benefits.

Yet another case came before the Supreme Court in 1976 and was decided in April 1977. In *Trimble* v. *Gordon* (1977), 430 U.S. 762, the court considered Section 12 of the Illinois Probate Act which provided that illegitimate children could only inherit by intestate succession from their mother. The court held this to be a violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The court noted that although the state of Illinois had a compelling interest to see the expeditious and orderly disposition of a decedent's estate, the state should provide some means with which an illegitimate child could attempt to prove his paternity. In addressing the argument that paternity is too difficult to prove when the alleged father is dead, the court noted that "* * * '[t]hose problems [of evidence] are not to be lightly brushed aside, but neither can they be made into an impenetrable barrier that works to shield otherwise invidious discrimination' * * *''' (citation omitted) *id.* at 771. Thus, despite the difficulties of proof in this type of an action, the court held that the problems of proof cannot be used to bar an illegitimate child from inheriting. Consequently, we see illegitimate children moving almost to the point of equal treatment between the two classes.

In 1978, yet another case, *Lalli* v. *Lalli* (1978), 439 U.S. 259, was argued before the Supreme Court on this issue. *Lalli* involved an illegitimate child who was attacking a New York statute as being unconstitutional because it denied him the right of inheritance. The New York statute provided that an illegitimate child may become legitimate to the father if, and only if, a court of competent jurisdiction has, during the lifetime of the father, made an order of filiation declaring paternity in a proceeding instituted during the pregnancy of the mother or within two years after the child's birth. The illegitimate child argued that the statute violated the Equal Protection Clause of the Fourteenth Amendment. The Supreme Court, however, disagreed with the illegitimate child's equal protection argument and found instead, as did the lower court, that due to the peculiar problems of proof in establishing paternity, the state had a right to require a filiation decree as the only acceptable form of proof to establish paternity. Thus, once again, the Supreme Court recognized that the evidentiary problem is the basis for denying an illegitimate child equal inheritance rights with his counterpart, the legitimate child.

Turning our sights to Ohio law, the Ohio Supreme Court addressed the issue of an illegitimate child's right of inheritance in the case of *White* v. *Randolph* (1979), 59 Ohio St. 2d 6, 13 O.O. 3d 3, 391 N.E. 2d 333. That case originated in the Franklin County Probate Court, was heard then by the Court of Appeals for Franklin County, and ultimately was reviewed by the Ohio Supreme Court. In *White,* an illegitimate daughter who was excluded from inheritance rights by operation of R.C. Chapter 2105 challenged the Ohio statutes as unconstitutionally denying equal protection. The probate court found that the illegitimate child could inherit if, and only if, one of the following had occurred: (1) the father formally acknowledged the child in probate court (R.C. 2105.18); (2) the father designated the child as his heir at law (R.C. 2105.15); (3) the father adopted the child; or (4) the father provided for the child in his will. Since none of those conditions was met, the probate court denied the child any right of inheritance. The Court of Appeals for Franklin County affirmed the lower court's decision, and the daughter appealed to the Ohio Supreme Court.

The Supreme Court reviewed the latest United States Supreme Court

decisions on this issue. The court noted that " 'proof of paternity, especially after the death of the alleged father, is difficult, and peculiarly subject to abuse.' " *White, supra,* at 8, 13 O.O. 3d at 5, 391 N.E. 2d at 334. The Ohio Supreme Court then compared the Ohio statutes to the Illinois Probate Code that was struck down in *Trimble* and found that the Ohio statutes provide substantially more constitutional protection for illegitimate children than did the Illinois statute. Continuing in its opinion, the Ohio Supreme Court looked at the New York statute which passed constitutional scrutiny in *Lalli* and found that the Ohio statutes and the New York statute were sufficiently the same in affording the proper amount of constitutional protection to illegitimate children. The Ohio Supreme Court concluded that the Ohio statutes were constitutional and justified their existence because of the difficulty of proof in a paternity-type action, especially when the alleged father is deceased.

As evidenced by the recent United States Supreme Court decisions, as well as the Ohio Supreme Court decision in *White* v. *Randolph,* the bottom line to denying an illegitimate child equal inheritance rights is that there is a substantial problem of proof of paternity, especially after the alleged father is dead. Today, however, we are entering into a new area. Science has developed a means to irrefutably prove the identity of an illegitimate child's father. No longer are we dependent upon fallible testimony, nor are we concerned that the decedent cannot be present to defend himself. The accuracy and infallibility of the DNA test are nothing short of remarkable. We live in a modern and scientific society, and the law must keep pace with these developments.

Historically, we have seen a steady progression in attempting to afford equal protection and equal rights for illegitimate children. The problems of proof which have been the basis of denying inheritance rights to illegitimate children have been removed by the advent of this new genetic testing. Therefore, this court can no longer be a participant in denying the opportunity to an illegitimate child to prove his paternity so that he may rightfully share in his father's estate.

*Judgment accordingly.*