2 Cal.App.4th 462 (1992)
3 Cal. Rptr.2d 536
Estate of RAYMOND DENIS SANDERS, Deceased.
LAUREL S., a Minor, etc., Petitioner and Appellant,
v.
TERRY SANDERS, as Executor, etc., Objector and Respondent.
Docket No. D012616.
Court of Appeals of California, Fourth District, Division One.
January 7, 1992.
*465 COUNSEL
Fred Uebbing for Petitioner and Appellant.
Seltzer, Caplan, Wilkins & McMahon, Bonnie Nelson Reading and Elinor T. Merideth for Objector and Respondent.
OPINION
TODD, J.
Christine S. (Christine), as guardian ad litem for her daughter Laurel, appeals an order denying a petition for heirship filed on behalf of Laurel in the probate of the estate of Laurel's putative father, Raymond Denis Sanders (Sanders). The order also rejected a request by Christine that DNA (genetic) tests be ordered to establish Sanders was Laurel's father.

FACTS
In his will dated December 12, 1975, Sanders, an educator and film-maker, bequeathed all of his property in equal shares to his three children: *466 Victoria Sanders; Peter N. Sanders, and Juliette Sanders. Sanders died on December 11, 1987. At the time, Sanders was married to Sherri Warren-Sanders. Their marriage occurred after the will was executed, making her a pretermitted heir. (See Prob. Code,[1] § 6560.) Sanders's will was admitted to probate, and his brother, Terry Sanders, was appointed personal representative.
Laurel was born September 4, 1978. Her mother, Christine, claims Laurel's father was Sanders.
On March 24, 1989, Christine, as guardian ad litem for Laurel, filed a request for special notice in the probate proceeding. Subsequently, on May 10, 1989, Christine filed a petition for heirship and determination of entitlement to distribution of the estate under former section 1080,[2] which claimed Laurel is the natural daughter of Sanders and entitled to a portion of his estate as a pretermitted heir. (See § 6570.) Included in the prayer of the petition was "subsequent discovery orders necessary to prove the paternity of Laurel ... by the deceased."[3] On June 6, 1989, the executor filed an objection to the petition for heirship filed on behalf of Laurel "on the grounds that no convincing credible evidence has been offered to substantiate Laurel['s] ... claim to be the natural daughter of decedent." Also in connection with the petition for heirship filed on behalf of Laurel, Victoria Sanders, a daughter of Sanders, filed a declaration on August 24, 1989, requesting evidence to support the alleged parent-child relationship. In her declaration, Victoria stated that in May 1989 the attorney for Victoria and her brother and sister sent a letter containing 34 questions to Christine and that the answers to those questions could help the estate and Sanders's children evaluate the paternity claim of Christine and Laurel. The declaration stated that Christine had not responded to the 34 questions.
On October 6, 1989, in connection with a status conference scheduled for October 13, 1989, Christine filed the following documents: (1) a declaration by an expert in DNA testing; (2) a letter from her attorney to counsel for the *467 executor and counsel for the Sanders children answering the 34 questions posed by the Sanders children; (3) a copy of Laurel's birth certificate showing the father as "not stated"; and (4) a May 28, 1980, check from Sanders marked as a "loan." The expert, Daniel D. Garner, declared that if blood samples from Laurel, Christine, the three Sanders children and the mothers of the three Sanders children were analyzed for DNA polymorphisms, his laboratory could verify whether Sanders was the father of Laurel.
In the letter answering the 34 questions, Christine related, among other things, she and Sanders met in April 1977 when she was a student at UCLA film school. Christine said they had an intimate relationship from late July 1977 through January 1, 1978, and that he was the only person with whom she was having sexual relations from July 1977 through May 1978. Christine stated she believes Laurel was conceived on either the 8th or 9th of December 1977. Christine said to her knowledge Sanders did not know she was pregnant with Laurel as he did not return her phone calls after they broke up in January 1978. Christine said that after Laurel was born Sanders admitted to her that he was Laurel's father, but that "he did not want to make more emotional and time commitments to another child." Christine said she did not ask Sanders for child support nor bring an action for paternity while he was alive because "I was afraid of possible reprisal from him regarding custody." Christine said the only time she asked Sanders for money occurred around 1980 after she was injured during a mugging and out of work for a while; Sanders loaned her $100.
The executor responded by filing, on January 8, 1990, a supplement to his objections to the petition for heirship filed on behalf of Laurel. In this filing, the executor claimed (1) there was insufficient evidence to establish a parent and child relationship under section 6408 and (2) the requested DNA tests of Sanders's surviving children and their mothers cannot fulfill and are not relevant to the requirements of section 6408.
On February 16, 1990, the probate court heard the matter, rejecting an oral request by Christine for a continuance.[4] The court found the evidence did not establish a parent and child relationship under section 6408 and Civil Code sections 7004 and 7006 and ordered Laurel is not entitled to be considered a child of Sanders. The court also denied the request for DNA tests. The order *468 denying the petition for heirship was filed March 19, 1990. Christine, as guardian ad litem for Laurel, appeals this order.

DISCUSSION

I
Christine contends the trial court erred in failing to order DNA genetic testing.
At the outset we note there were two implicit[5] proposals by Christine for genetic testing before the court: (1) The first, which can be inferred from papers filed October 6, 1989, called for blood samples to be taken from Christine, Laurel, Victoria Sanders, Peter Sanders and Juliette Sanders, as well as the mothers of Victoria, Peter and Juliette; (2) The second, suggested in papers filed February 16, 1990, called for blood samples to be taken from Christine, Laurel, Victoria Sanders, Peter Sanders and Juliette Sanders. Inasmuch as the second proposal was filed on the day of the determinative hearing in connection with a motion for a continuance, it was within the trial court's discretion whether to consider the papers. Since the trial court denied the oral request for a continuance and the order denying the petition for heirship includes language referring to the "DNA tests of the decedent's surviving adult children and their mothers," we conclude the trial court did not consider the second proposal for DNA testing  i.e., the proposal that would not have required blood samples be taken from the mothers of Sanders's surviving adult children. Nonetheless, we shall consider both proposals.
(1) First, the trial court's refusal to order DNA testing of Sanders's surviving adult children along with their mothers clearly was correct. There can be no doubt the court lacked authority to order the mothers of Sanders's surviving adult children to give blood samples. (See William M. v. Superior Court (1990) 225 Cal. App.3d 447 [275 Cal. Rptr. 103] [in paternity action, parents of deceased putative father not subject to order requiring them to submit to blood tests].) Here, these mothers are not parties to the probate *469 proceeding; hence, Code of Civil Procedure section 2032,[6] which provides a procedure by which a party whose physical condition is in dispute and is a material issue may be required by another party to the action to submit to an examination, does not apply to these individuals. Nor is Evidence Code section 892[7] applicable to them. Given the substantial privacy interests involved (see Schmerber v. State of California (1966) 384 U.S. 757, 767 [16 L.Ed.2d 908, 917-918, 86 S.Ct. 1826]) and the lack of any statutory authority to order these individuals to submit to blood tests, we find no fault with the trial court's order here.[8]
(2a) With respect to Christine's second proposal for DNA testing of Sanders's surviving adult children, Christine argues on appeal it was proper under Code of Civil Procedure section 2032 because the surviving adult children are "interested parties" (§ 48) to the probate proceeding. The executor counters that Christine's proposed DNA tests  whether or not they involve the mothers of Sanders's adult children  are irrelevant in a probate proceeding under California's statutory scheme.
The key statute at issue is section 6408, which at the relevant time[9] provided in pertinent part:
"(a) A relationship of parent and child is established for the purpose of determining intestate succession by, through, or from a person in the following circumstances:
"(1) Except as provided in Section 6408.5, the relationship of parent and child exists between a person and his or her natural parents, regardless of the marital status of the natural parents.
*470 ".... .... .... .... .... .... ....
"(c) For the purpose of determining whether a person is a `natural parent' as that term is used in Section 6408 and 6408.5:
"(1) A natural parent and child relationship is established where that relationship is presumed and not rebutted pursuant to the Uniform Parentage Act, Part 7 (commencing with Section 7000) of Division 4 of the Civil Code.
"(2) A natural parent and child relationship may be established pursuant to any other provisions of the Uniform Parentage Act, except that the relationship may not be established by an action under subdivision (c) of Section 7006 of the Civil Code unless either (A) a court order was entered during the father's lifetime declaring paternity or (B) paternity is established by clear and convincing evidence that the father has openly and notoriously held out the child as his own...." (Stats. 1985, ch. 982, § 21, p. 3118.)
Christine argues the use of the word "may" in subdivision (c)(2) of the statute renders it a permissive provision rather than a restrictive one. In other words, Christine argues that the statute, while allowing for an action under Civil Code section 7006 to establish paternity and therefore heirship, does not preclude other ways of establishing heirship through paternity, such as DNA testing.
Using well-established principles of statutory construction, we conclude Christine is wrong.
(3) In People v. Wesley (1988) 198 Cal. App.3d 519, at page 522 [243 Cal. Rptr. 785], this court recently summarized several principles of statutory interpretation that are pertinent here:
"The fundamental rule of statutory construction is ascertaining the Legislature's intent so as to effectuate the purpose of the law. (Select Base Materials v. Board of Equal. (1959) 51 Cal.2d 640, 645....) A court first turns to the words of the statute itself, giving significance to every word, phrase, sentence and part of an act in furtherance of the legislative purpose if possible. (People v. Black (1982) 32 Cal.3d 1, 5 ....) A construction which renders any part of a statute surplusage should be avoided. (People v. Gilbert (1969) 1 Cal.3d 475, 480....) The statutory language must be construed in context and the various parts of a statute `must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole.' (People v. Black, supra, p. 5.) The legislative history as well as the historical circumstances of a statute's enactment may be considered in ascertaining the Legislature's intent."
*471 (2b) Contrary to Christine's argument, the key wording in section 6408, subdivision (c)(2) is not "may," but rather "except that the relationship may not be established by...."
For purposes of intestate succession,[10] section 6408 provides the rules for determining parent-child relationships and inheritance rights. Under subdivision (c)(1), a natural parent-child relationship or paternity is established when there is a presumption of the parent-child relationship under Civil Code section 7004 and that presumption has not been rebutted. Subdivision (c)(2), with its "may" language, merely allows other provisions of the Uniform Parentage Act to be used to establish a natural parent-child relationship provided that a court decree declaring paternity was entered while the father was alive or there is clear and convincing evidence that the father, while alive, had openly and notoriously held out the child as his own. In other words, for our purposes subdivision (c)(2) applies only under one of two conditions  neither of which is present here. In such situations, subdivision (c)(2)  by its very language  does not provide an alternative means of establishing a natural parent-child relationship or paternity. Therefore, here, where there is no unrebutted presumption of paternity and there is neither a court decree declaring paternity entered during Sanders's lifetime nor clear and convincing evidence that he had openly and notoriously held out Laurel as his child, section 6408 does not contemplate any means of establishing paternity.
Our review of the legislative history of section 6408 supports this conclusion. Section 6408 was originally enacted in 1983 as part of a comprehensive redrafting of the Probate Code pursuant to recommendations of the California Law Revision Commission. (Stats. 1983, ch. 842, § 55, pp. 3083-3084, operative Jan. 1, 1985.) Section 6408 superseded sections 255[11] (dealing with parent-child relationships and rights of succession) and 257 (dealing with inheritance rights of adopted children). (Tentative Recommendation Relating to Wills and Intestate Succession, 16 Cal. Law Revision Com. Rep. (1982) p. 2460.)
As originally introduced, the 1983 legislation (Assem. Bill No. 25) incorporated the recommendation of the California Law Revision Commission that section 6408 should read as follows:
*472 "(a) If, for purposes of intestate succession, a relationship of parent and child must be established to determine succession by, through, or from a person:
"(1) Except as provided in paragraph (3), the relationship of parent and child exists between a child and its natural parents, regardless of the marital status of the natural parents.
"(2) The relationship of parent and child exists between a child and its adoptive parents.
".... .... .... .... .... .... ....
"(b) For purposes of intestate succession, a parent and child relationship exists where such relationship is (1) presumed and not rebutted pursuant to the Uniform Parentage Act, Part 7 (commencing with Section 7000) of Division 4 of the Civil Code, or (2) established pursuant to the Uniform Parentage Act. Nothing in this subdivision limits the methods by which the relationship of parent and child may be established." (Tentative Recommendation Relating to Wills and Intestate Succession, supra, 16 Cal. Law Revision Com. Rep. pp. 2459-2460, italics added.) As the Law Revision Commission noted, this version of section 6408 is the same in substance as section 2-109 of the Uniform Probate Code.[12] (16 Cal. Law Revision Com. Rep., supra, p. 2460.) The commission also noted that in this version, section 6408, subdivision (b) continues the substance of subdivision (d) of former section 255. (Ibid.) Additionally, the commission stated the second sentence of this version of section 6408, subdivision (b) "makes clear that the parent and child relationship may be established in such other proceedings as a child support action." (Ibid.)
However, during the legislative process, amendments were made to Assembly Bill No. 25, including one relevant to this case that rewrote the proposed section 6408, subdivision (b), as follows:
"(b) For purposes of intestate succession:
*473 "(1) A parent and child relationship is established where that relationship is presumed and not rebutted pursuant to the Uniform Parentage Act, Part 7 (commencing with Section 7000) of Division 4 of the Civil Code.
"(2) A parent and child relationship may be established pursuant to any other provisions of the Uniform Parentage Act, except that the relationship may not be established for the purposes of intestate succession by an action under subdivision (c) of Section 7006 of the Civil Code unless either (i) a court order was entered during the father's lifetime declaring paternity or (ii) paternity is established by clear and convincing evidence that the father has openly and notoriously held out the child as his own." This version of section 6408 was enacted. (Stats. 1983, ch. 842, § 55, pp. 3083-3084.)[13]
Whereas the original version of section 6408 as first proposed by the California Law Revision Commission continued the substance of former section 255, subdivision (d), the version enacted by the Legislature, by including the "except" clause of paragraph (2) of section 6408, subdivision (b) "restricts the rule of former Section 255 by requiring that if a court order establishing paternity under subdivision (c) of Section 7006 of the Civil Code is entered after the father's death it must, for the purposes of intestate succession, be supported by clear and convincing evidence that the father has openly and notoriously held out the child as his own." (See Sen. Com. on Judiciary Rep. on Assem. Bill No. 25, 3 Sen. J. (1983-1984 Reg. Sess.) p. 4883.)[14]
Here, the Legislature rejected the original version of what was then designated section 6408, subdivision (b)(2), which would have allowed establishment of the parent and child relationship largely without restriction. In its place, the Legislature substituted  and eventually enacted  a different provision, which significantly restricted the methods of establishing paternity in probate proceedings. (4) "The rejection by the Legislature of a specific provision contained in an act as originally introduced is most persuasive to the conclusion that the act should not be construed to include *474 the omitted provision." (Rich v. State Board of Optometry (1965) 235 Cal. App.2d 591, 607 [45 Cal. Rptr. 512].)[15]
Another aspect of the legislative history bolsters our conclusion. Since 1983, when the Legislature adopted this restrictive view of establishing paternity in probate proceedings effective January 1, 1985, the Legislature has revisited section 6408 on three occasions, and has not altered its substantive position on the issue. (See fns. 9 and 13, ante.) Clearly, it has continued to be the intent of the Legislature to discourage dubious paternity claims made after a father's death for the sole purpose of inheritance.
(5) Christine argues against this restrictive approach by relying on section 1000, which provides: "Except to the extent that this code provides applicable rules, the rules of practice applicable to civil actions apply to, and constitute the rules of practice in, proceedings under this code." According to Christine, section 1000, is authority for applying Code of Civil Procedure section 2032 to this proceeding. We disagree. Section 6408 provides the rules for determining parent-child relationships for purposes of intestate succession. (See § 6400 as discussed in fn. 10, ante.) Thus, section 1000 by its very terms supports our conclusion that the rules of section 6408 are the operative ones here, regardless of their restrictive nature. Not only does section 1000 state "[e]xcept to the extent that this code provides applicable rules ...," but there also is an established rule of statutory construction that "a specific statutory provision relating to a particular subject will govern, as against a general provision, in matters concerning that subject." (County of San Diego v. Bouchard (1987) 195 Cal. App.3d 34, 39 [240 Cal. Rptr. 391].)
(6) In her reply brief and at oral argument, Christine argues section 11700[16] supports her position that section 6408 is not the exclusive method of determining paternity here. Christine has misconstrued section 11700, *475 which is merely a procedural provision that permits a petition for court determination of persons entitled to distribution of a decedent's estate and sets up a jurisdictional time limit for the filing of the petition. In other words, section 11700 defines a type of probate proceeding and its limitations period. Furthermore, Christine's reliance on Estate of Simmons (1966) 64 Cal.2d 217 [49 Cal. Rptr. 369, 411 P.2d 97], which interpreted former section 1080, the predecessor statute to section 11700, is misplaced. In Simmons, supra, 64 Cal.2d at page 220, when the court states "Section 1080 does not provide the exclusive method of determining heirship," the court was referring to various types of proceedings that could be instituted to protect one's interests, such as a petition for distribution or a will contest. That is the import of the word "may" in former section 1080, as well as in section 11700, namely that a potential heir has various options in deciding what type of proceeding he or she will utilize. What the court was discussing in Simmons has nothing to do with the definitive rules set forth in section 6408, which govern determination of whether a parent-child relationship existed. In this case, section 11700 is merely a procedural vehicle for applying section 6408.
(7) We are fully cognizant that the restrictive nature of section 6408, subdivision (c)(2), in establishing rules for proof of paternity in probate proceedings has a harsh effect on children born out of wedlock. At least, in part, the statute invokes a sanction against the child for the laches of the mother in not securing a court decree of paternity during the lifetime of the father. We also are fully cognizant of a host of United States Supreme Court decisions over the past two decades that have consistently mandated equal legal treatment of legitimate and illegitimate children in a broad range of substantive areas.[17] But this state's Legislature in 1983 rejected a permissive version of the statute, and this rejection is a clear indication of legislative intent. The Legislature determined that the interest in providing for just and orderly distribution of property at death required a mechanism "to discourage dubious paternity claims from being made after the father's death for the sole purpose of inheritance." (See fn. 15, ante.) Moreover, the Legislature since 1983 has repeatedly reaffirmed this determination.
(8) As stated above, our task in construing any law is to ascertain the legislative intent. (Metromedia, Inc. v. City of San Diego (1982) 32 Cal.3d *476 180, 187 [185 Cal. Rptr. 260, 649 P.2d 902].) A "`court cannot, ... in the exercise of its power to interpret, rewrite the statute.... That is a legislative and not a judicial function.'" (Blair v. Pitchess (1971) 5 Cal.3d 258, 282 [96 Cal. Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206], citing Seaboard Acceptance Corp. v. Shay (1931) 214 Cal. 361, 369 [5 P.2d 882].)
Christine argues that scientific advances, particularly with genetic testing, have rendered our construction of section 6408, subdivision (c)(2), obsolete because these advancements have removed the uncertainty of proving paternity in probate proceedings, which is the justification for the restrictive nature of the statute. Toward this end, Christine has referred us to a wealth of material concerning the efficacy of DNA testing in determining paternity as well as its usefulness in other forensic endeavors, such as identification of criminal suspects. While perhaps only the proverbial ostrich with its head in the sand would dispute the fact remarkable progress has been made in these areas in recent years, we need not dwell on these advances.[18] This argument, along with the supporting material, is more appropriately addressed to the Legislature. (9) "Courts do not sit as super-legislatures to determine the wisdom, desirability or propriety of statutes enacted by the Legislature." (Estate of Horman (1971) 5 Cal.3d 62, 77 [95 Cal. Rptr. 433, 485 P.2d 785].) The reexamination of the law that Christine urges on the basis of scientific advances must come from the Legislature.
(10) To the extent that Christine asks us to strike down section 6408 as violative of the principle of equal protection, we decline to do so on the basis of Lalli v. Lalli (1978) 439 U.S. 259 [58 L.Ed.2d 503, 99 S.Ct. 518]. In Lalli, a plurality of the United States Supreme Court upheld a New York statute that allowed an illegitimate child to inherit from his intestate father only if a court order declaring paternity had been entered during the father's lifetime.[19] The high court found the purpose of the statute was to provide for the just and orderly disposition of a decedent's property in cases involving paternity claims, which present difficult problems of proof when the father is no longer alive. (439 U.S. at pp. 268-271 [58 L.Ed.2d at pp. 511-513].) The high court concluded that requiring a court order establishing paternity to be *477 issued during the father's lifetime is substantially related to the state interest the statute was intended to promote. (Id. at pp. 271-276 [58 L.Ed.2d at pp. 513-516].)[20]
Finally, we note that Christine has cited a number of out-of-state authorities that allow DNA testing in paternity cases, including one involving a probate case. (Alexander v. Alexander (1988) 42 Ohio Misc.2d 30 [537 N.E.2d 1310]; see also Minn. Stat. § 257.62[21] involving using blood tests on relatives of decedents to determine paternity.) Again, we must reiterate our role as a court is to interpret the statute before us. While, in light of the scientific advancements of recent years, there are strong public policy arguments[22] in favor of lifting the restrictions of section 6408, subdivision (c)(2), those arguments are better made to the Legislature.
(2c) In sum, under section 6408, which was the operative statute, the trial court did not have authority to order DNA tests to determine the paternity issue. In light of the nonexistence of a court decree issued during Sanders's lifetime declaring paternity, there was only one method to establish paternity here. That was to show by clear and convincing evidence that Sanders openly and notoriously held out Laurel as his child. DNA testing has *478 nothing to do with that; as such the efficacy of DNA testing has never been a relevant issue. There was no error committed by the trial court in refusing to order DNA tests.

II
(11) The record shows the trial court correctly ruled the evidence did not satisfy any of the requirements of section 6408 to establish paternity.
Paternity was not established under section 6408, subdivision (c)(1), because there was no evidence to establish the parent-child relationship by presumption of marriage, attempted marriage or Sanders having received Laurel into his home and openly acknowledging the child as his own. (See Civ. Code, § 7004.) Having failed to establish this last factor  and there being no court order declaring paternity issued during Sanders's lifetime  paternity could not be established under section 6408, subdivision (c)(2), either.

DISPOSITION
Affirmed.
Kremer, P.J., and Wiener, J., concurred.
Appellant's petition for review by the Supreme Court was denied April 2, 1992. Mosk, J., and Arabian, J., were of the opinion that the petition should be granted.
NOTES
[1] All statutory references are to the Probate Code unless otherwise specified.
[2] As of July 1, 1989, sections 1080-1082 were repealed and replaced with sections 11700-11705. (Stats. 1988, ch. 1199, §§ 56.5, 91.5, pp. 3906, 3974-3985.) In the most recent revision of the Probate Code, section 11700 was repealed and reenacted without change, operative July 1, 1991. (Stats. 1990, ch. 79, §§ 13, 14, operative July 1, 1991.) Under section 3 the new law governs here.
[3] Also, on May 10, 1989, Christine filed a second document in which she objected to the executor's second account and report as well as other filings by the executor in the probate proceeding. On May 23, 1989, the probate court heard and ordered settlement of the executor's second account and report, approving an agreement concerning distribution of the estate in settlement of the claims of Sander's surviving spouse and for partial distribution. The court order, filed June 22, 1989, required the estate to remain open pending the determination of the rights of Laurel.
[4] In addition to requesting a continuance, on February 16, 1990, Christine filed a declaration by another expert, Dr. Jeffrey Morris, stating he could determine if Sanders was the father of Laurel by DNA analysis of blood samples taken from Laurel, Christine and the three children of Sanders. In other words, according to this second expert's declaration, it was not necessary to take blood samples from the mothers of Sanders's children in order to determine if Sanders was the father of Laurel.
[5] Our review of the record does not disclose any formal request or motion by Christine for DNA testing. However, the petition for heirship filed May 10, 1989, prays for "subsequent discovery orders necessary to prove the paternity of Laurel ... by the deceased." Subsequently, Christine filed declarations by two DNA experts. We infer from these declarations in conjunction with the prayer from the petition for heirship that Christine proposed DNA testing on two occasions.
[6] Code of Civil Procedure section 2032, subdivision (a), provides in pertinent part: "Any party may obtain discovery, subject to the restrictions set forth in Section 2019, by means of a physical or mental examination of (1) a party to the action, (2) an agent of any party, or (3) a natural person in the custody or under the legal control of a party, in any action in which the mental or physical condition (including the blood group) of that party or other person is in controversy in the action."
[7] Evidence Code section 892 reads: "In a civil action in which paternity is a relevant fact, the court may upon its own initiative or upon suggestion made by or on behalf of any person whose blood is involved, and shall upon motion of any party to the action made at a time so as not to delay the proceedings unduly, order the mother, child and alleged father to submit to blood tests...."
[8] On appeal, it appears Christine has conceded that blood samples from the mothers of Sanders's adult children could not have been legally ordered.
[9] In 1990, the Legislature repealed and reenacted the Probate Code, including section 6408, effective July 1, 1991. (Stats. 1990, ch. 79, §§ 13, 14.) This legislation did not make any substantive changes to section 6408 that affect this case. Subdivisions (a) and (c) of former section 6408 are now designated as subdivisions (a) and (f), respectively, of the new section 6408. All subsequent references to section 6408 are to the operative statute at the time of this proceeding (Stats. 1985, ch. 982, § 21, p. 3118) unless otherwise specified.
[10] Section 6400 provides: "Any part of the estate of a decedent not effectively disposed of by will passes to the decedent's heirs as prescribed in this part." Section 6400 is the first section of part 2 (entitled "Intestate Succession") of division 6 (entitled "Wills and Intestate Succession") of the Probate Code. Section 6408 is also contained in part 2 of division 6 of the Probate Code.
[11] Former Probate Code section 255 read in pertinent part: "(d) For purposes of this division, a parent and child relationship exists where such relationship is (1) presumed and not rebutted pursuant to, or (2) established pursuant to, Part 7 (commencing with Section 7000) of Division 4 of the Civil Code." (Stats. 1975, ch. 1244, § 25, p. 3204.)
[12] Section 2-109 of the Uniform Probate Code provided, at the relevant time: "If, for purposes of intestate succession, a relationship of parent and child must be established to determine succession by, through, or from a person,

"(1) an adopted person is the child of an adopting parent and not of the natural parents except that adoption of a child by the spouse of a natural parent has no effect on the relationship between the child and either natural parent.
"(2) In cases not covered by Paragraph (1), a person is the child of its parents regardless of the marital status of its parents and the parent and child relationship may be established under the [Uniform Parentage Act]."
[13] Section 6408 was amended in 1984 (Stats. 1984, ch. 892, § 41.5, p. 3000) and in 1985 (Stats. 1985, ch. 982, § 21, p. 3118) without substantive change to the issues involved here. (17 Cal. Law Revision Com. Rep. (1984) p. 537; 18 Cal. Law Revision Com. Rep. (1985) p. 289.) The 1985 amendment redesignated section 6408, subdivision (b) as subdivision (c).
[14] "Statements in Legislative committee reports concerning statutory objects and purposes which are in accord with a reasonable interpretation of the statute serve as legitimate aids in determining Legislative intent." (Curtis v. County of Los Angeles (1985) 172 Cal. App.3d 1243, 1250 [218 Cal. Rptr. 772].)
[15] Material included with correspondence by Assemblyman Alister McAlister, the author of Assembly Bill No. 25, to Governor Deukmejian seeking the Governor's approval of the legislation indicates that the purpose of the restrictive language in section 6408, subdivision (b)(2), as amended, was "to discourage dubious paternity claims from being made after the father's death for the sole purpose of inheritance." (See Sept. 6, 1983, letter from Assemblyman A. McAlister to Gov. Deukmejian and enclosures.) Statements of authoring legislators that cast light on the history of the measure and the arguments before the Legislature when it considered the matter  as opposed to the personal beliefs of the legislator (which may not reflect the collective view of the enacting legislative body)  are indicia of legislative intent. (County of San Diego v. Superior Court (1986) 176 Cal. App.3d 1009, 1021 [222 Cal. Rptr. 484].)
[16] Section 11700 provides: "At any time after letters are first issued to a general personal representative and before an order for final distribution is made, the personal representative, or any person claiming to be a beneficiary or otherwise entitled to distribution of a share of the estate, may file a petition for a court determination of the persons entitled to distribution of the decedent's estate. The petition shall include a statement of the basis for the petitioner's claim."
[17] See, e.g., Clark v. Jeter (1988) 486 U.S. 456 [100 L.Ed.2d 465, 108 S.Ct. 1910]; Reed v. Campbell (1986) 476 U.S. 852 [90 L.Ed.2d 858, 106 S.Ct. 2234]; Trimble v. Gordon, (1977) 430 U.S. 762 [52 L.Ed.2d 31, 97 S.Ct. 1459]; Weber v. Aetna Casualty & Surety Co. (1972) 406 U.S. 164 [31 L.Ed.2d 768, 92 S.Ct. 1400]; Levy v. Louisiana (1968) 391 U.S. 68 [20 L.Ed.2d 436, 88 S.Ct. 1509].
[18] We do note, however, that in California the appropriate method of validating new scientific methodology is the Kelly-Frye test. (Frye v. United States (D.C. Cir.1923) 293 Fed. 1013 [54 App.D.C. 46]; People v. Kelly (1976) 17 Cal.3d 24 [130 Cal. Rptr. 144, 549 P.2d 1240].) Recently, the Second District Court of Appeal, in a murder case, issued the first published opinion in this state validating DNA testing under the Kelly-Frye test. (People v. Axell (1991) 235 Cal. App.3d 836 [1 Cal. Rptr.2d 411].
[19] As such, the New York statute was more restrictive than section 6408, subdivision (c)(2).
[20] The plurality opinion made the following observation, which we find also has relevance to section 6408, subdivision (c)(2): "We do not question that there will be some illegitimate children who would be able to establish their relationship to their deceased fathers without serious disruption of the administration of estates and that, as applied to such individuals, [the New York statute] appears to operate unfairly. But few statutory classifications are entirely free from the criticism that they sometimes produce inequitable results. Our inquiry under the Equal Protection Clause does not focus on the abstract `fairness' of a state law, but on whether the statute's relation to the state interests it is intended to promote is so tenuous that it lacks the rationality contemplated by the Fourteenth Amendment." (Lalli, supra, 439 U.S. at pp. 272-273 [58 L.Ed.2d at pp. 513-515].)
[21] This statute provides in pertinent part: "Subdivision 1. Blood tests required. The court may, and upon request of a party shall, require the child, mother, or alleged father to submit to blood tests. If the alleged father is dead, the court may, and upon request of a party shall, require the decedent's parents or brothers or sisters or both to submit to blood tests. However, in a case involving these relatives of an alleged father, who is deceased, the court may refuse to order blood tests if the court makes an express finding that submitting to the tests presents a danger to the health of one or more of these relatives that outweighs the child's interest in having the tests performed. Unless the person gives consent to the use, the results of any blood tests of the decedent's parents, brothers or sisters may be used only to establish the right of the child to public assistance including but not limited to social security and veterans' benefits. The tests shall be performed by a qualified expert appointed by the court." (Minn. Stat. § 257.62 (1991).)
[22] As the court in Alexander, supra, 537 N.E.2d at page 1314, noted: "[T]he bottom line to denying an illegitimate child equal inheritance rights is that there is a substantial problem of proof of paternity, especially after the alleged father is dead. Today, however, we are entering into a new area. Science has developed a means to irrefutably prove the identity of an illegitimate child's father. No longer are we dependent upon fallible testimony, nor are we concerned that the decedent cannot be present to defend himself. The accuracy and infallibility of the DNA test are nothing short of remarkable. We live in a modern and scientific society, and the law must keep pace with these developments."