[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Memorandum Filed August 15, 1997
On October 21, 1993, the plaintiff, Shannon Lach, commenced this paternity action against the defendant, Richard J. Welch, as administrator of the estate of Michael R. Welch. Pursuant to General Statutes § 46b-160, the plaintiff seeks an adjudication of paternity of Kaitlyn Ruddy, her minor child. Kaitlyn was born out of wedlock on November 12, 1990. In her petition, the plaintiff alleges that Kaitlyn was fathered by Michael Welch, who lived with the plaintiff from January 1990, through and including April 1990. On June 1, 1991, prior to the commencement of any paternity proceedings, Michael Welch died as the result of an automobile accident.
Presently before the court are two motions. The first is a motion to cite in Patricia Welch, Michael's mother, claiming that she is a necessary party to a determination of paternity and estate distribution. The second motion seeks genetic testing of Patricia Welch, Richard Welch, the plaintiff and the minor child to determine whether Michael is Kaitlyn's father. The plaintiff filed memoranda of law in support of both motions.
The attorney for the minor child filed a brief in support of both motions requesting that the court grant both CT Page 12580 motions and consider adding the defendant, Richard J. Welch, in his individual capacity. In the alternative, or in addition to DNA testing of the putative grandparents, counsel for the minor child seeks an order of exhumation of the body of the deceased putative father for purposes of genetic testing.
The defendant filed objections to both the motion to cite in Patricia Welch and the motion for genetic testing along with supporting memoranda. The defendant, however, did not object to the request for exhumation of the body of the deceased putative father for purposes of genetic testing beyond claiming that the court lacks subject matter jurisdiction to determine paternity after the death of the putative father.
I. Motion to Cite In Party Defendant
The plaintiff argues that Patricia Welch is a necessary party to the paternity action based on her status as an heir of her deceased son's intestate estate and should thus be joined in this paternity action for purposes of genetic testing. The defendant argues that the motion to cite in Patricia Welch should be denied on the grounds that this court lacks subject matter jurisdiction[1] and no valid cause of action lies against Patricia Welch as she is neither a proper nor necessary party to the paternity action.
General Statutes § 52-102 provides: "Upon motion made by any party or nonparty to a civil action, the person named in the party's motion or the nonparty so moving, as the case may be, (1) may be made a party by the court if that person has or claims an interest in the controversy, or any part thereof, adverse to the plaintiff, or (2) shall be made a party by the court if that person is necessary for a complete determination or settlement of any question involved therein: provided no person who is immune from liability shall be made a defendant in the controversy." "[A] court may refuse to proceed with litigation if a claim cannot properly be adjudicated without the presence of those indispensable persons whose substantive rights and interests will be necessarily and materially affected by its outcome. General Statutes § 52-102(2); Practice CT Page 12581 Book § 99." (Footnotes omitted.) Hilton v. City of NewHaven, 233 Conn. 701, 722, 661 A.2d 973 (1995). "Parties are considered indispensable when they not only have an interest in the controversy, but an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such condition that its final [disposition] may be . . . inconsistent with equity and good conscience . . . Indispensable parties must be joined because due process principles make it essential that [such parties] be given notice and an opportunity to protect [their] interests by making [them] a party to the [action] . . . Necessary parties, in contrast, are those [p]ersons having an interest in the controversy, and who ought to be made parties, in order that the court may act on that rule which requires it to decide on, and finally determine the entire controversy, and do complete justice, by adjusting all the rights involved in it . . . [B]ut if their interests are separable from those of the parties before the court, so that the court can proceed to a decree, and do complete and final justice, without affecting other persons not before the court, the latter are not indispensable parties." (Citations omitted; internal quotation marks omitted.)Napoletano v. Cigna Healthcare of Connecticut, Inc.,238 Conn. 216, 225-26 n. 10, 680 A.2d 127 (1996).
The defendant argues that Patricia Welch has no interest in the present case in controversy whereas the plaintiff argues that Patricia Welch, as an heir to her deceased son's estate, does have an interest in the paternity determination because any disposition of the intestate estate will be affected if Kaitlyn is Michael's child.
This court finds that Patricia Welch is an indispensable party to this paternity action because she has "an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such condition that its final [disposition] may be . . . inconsistent with equity and good conscience . . ." Napoletano v. Cigna Healthcare ofConnecticut, Inc., supra, 238 Conn. 225 n. 10. "It is easier to justify the compelled testing of collateral persons when the deceased's estate is at question and CT Page 12582 the collateral persons are beneficiaries under the estate. By refusing to accede to DNA tests, collateral persons withhold evidence that is highly probative and often determinative. Equity demands that those seeking to profit from a denial of paternity not be allowed to withhold crucial evidence that could prove paternity." C.N. Le Ray, "Implications of DNA Technology on Posthumous Paternity Determination: Deciding the Facts When Daddy Can't Give His Opinion," 35 B.C.L. Rev. 747, 789 (1994). Although the question of the decedent's estate is not at issue in the present case, Patricia Welch's interest in the paternity action is that her share in the intestate succession of her deceased son's estate will be affected if Kaitlyn is found to be the daughter of Michael Welch. Furthermore, as discussed below, the issue of paternity can be determined with a higher degree of accuracy from testing the paternal grandparents as compared to the testing of the decedent's remains.
The defendant also argues that General Statutes § 46b-160 allows for commencement of paternity proceedings by "service on the putative father of a verified petition . . ." Accordingly, the defendant argues, the statute is devoid of any provision for service on any party defendant other than the putative father and nothing else in chapter 825y provides vehicle for bringing a paternity action against anyone but the putative father. Thus, the defendant argues, the motion to add Patricia Welch as a party defendant should be denied.
"A deceased putative father . . . cannot be a party to a paternity action. Instead, he may only be represented by a party authorized by law." Travis v. ConticoInternational, Inc., 928 S.W.2d 367, 370 (Mo.App.E.D. 1996). In the present case, the administrator of the estate was served with the paternity petition because he is the representative of the estate. Furthermore, the statute relied on by the defendant, General Statutes § 46b-160, provides the steps for service and notice in paternity actions. "A defendant may contest the personal jurisdiction of the court even after having entered a general appearance, but must do so by filing a motion to dismiss within thirty days of filing of an appearance." (Internal quotation marks omitted.) CT Page 12583Brunswick v. Inland Wetlands Commission,222 Conn. 541, 551, 610 A.2d 1260 (1992). See also, Knipple v.Viking Communications, 236 Conn. 602, 605-06,674 A.2d 426 (1996). If the defendant believed he could not be served, that lack of in personam jurisdiction should have been raised through a motion to dismiss. The time for raising lack of personal jurisdiction has passed.
In essence, the defendant is arguing that Patricia Welch cannot be added as a party because there is only one individual that is subject to a paternity action and that is the putative father. The court finds this argument unpersuasive especially in light of its previous holdings regarding posthumous paternity determinations.
Additionally, the defendant argues that Patricia Welch has no legal duty nor suffers any penalty in her capacity as the putative grandmother, and is thus immune from liability. Under General Statutes § 52-102, "no person who is immune from liability shall be made a defendant in the controversy." Aside from setting forth the language of the statute and a definition of immunity as taken from Black's Law Dictionary, the defendant offers no authority to support the immunity argument. This court was not able to uncover any authority one way or the other on the issue of possible immunity under the circumstances of this case.
Lastly, the defendant argues that her presence is not necessary for a complete determination of any question involved in this action because DNA testing is not the only method possible to resolve plaintiffs claims equitably. Thus, Patricia Welch is not necessary within the meaning of General Statutes § 52-102. As stated above, this court finds Patricia Welch to be, not only necessary, but indispensable to this paternity action. Although this court recognizes that exhumation of the deceased putative father provides an alternate to DNA testing on Richard and Patricia Welch, it also recognizes the inherent proof problems of posthumous DNA testing and in fairness to all parties grants the motion to cite in Patricia Welch as a party defendant and adds Richard J. Welch in his individual CT Page 12584 capacity as requested by counsel for the minor child.
II. Motion for Genetic Testing
The plaintiff has moved for genetic testing of the plaintiff, the minor child, Patricia and Richard Welch. Counsel for the minor child has joined in this motion and requests, as an alternative, exhumation of the body of the deceased putative father for purposes of DNA testing. The defendant objected to the request for DNA testing of Michael and Patricia Welch.
 [M]odern scientific tests can determine, with nearly perfect accuracy, who is the true biological father of a child. Palomba v. Gray, 208 Conn. 21, 36-37, 543 A.2d 1331 (1988) (Shea, J., concurring) ("[t]he use of these new techniques has raised to such a high level the ability of the scientific community to identify the father of a child whose paternity is disputed that the resolution of such an important issue should no longer be had without such scientific testimony").
Weidenbacher v. Duclos, 234 Conn. 51, 71,661 A.2d 988 (1995). "General Statutes § 46b-168 provides that the court `may' order blood tests upon a motion by any party. Thus the order is discretionary." In Re DonnaM., 33 Conn. App. 632, 646, 519 A.2d 623 (1987).
As this court previously stated in its memorandum of decision Re: Motion to Strike, dated June 13, 1994, the advent of "DNA fingerprinting" has provided an even more remarkable medical advancement. DNA is a molecule that carries the body's genetic information, and is contained in every living organism in every cell which has a nucleus (over 99% of the cells in the human body). DNA fingerprinting allows the analyst to create a "print" of a person's genetic pattern as found in DNA extracted from the person's blood or tissue sample. Each person's genetic structure is unique and given the role that DNA plays in heredity, the prints can then be compared to other individuals' prints for purposes of determining whether the parties are related.[2] J.E. Cullins, Jr. "Should the Legitimate Child Be Forced to Pay for the Sins of her Father? CT Page 12585Sudwischer v. Estate of Hoffpauir," 53 La.L. Rev. 1675, 1719 (May 1993). In People v. Wesley, 533 N.Y.S.2d 643,140 Misc.2d 306 (1988), affirmed, 589 N.Y.S.2d 197
(A.D. 3 Dept. 1992), the court discussed the revolutionary aspect of DNA fingerprinting in the context of a criminal prosecution. The court stated: "DNA Fingerprinting is at the "cutting edge" of forensic science . . . DNA fingerprinting is a genetic and molecular biological process that has its basis in the fact that each individual has an entirely unique genetic "signature" derived in turn from the fact that the overall configuration of the DNA, found in every cell in the human body (and for that matter in every living organism) containing a nucleus — over 99% of the cells of the human body — is different in every individual except in the case of identical twins. This fact is not only generally accepted by the scientific community to which it is related, but is uniformly accepted therein.
"Related to this fact and fully accepted by the scientific community, is the further factor that in each individual the configuration of DNA contained in one cell is the same for every cell in the body of that individual. Thus, for the purpose of DNA fingerprinting, DNA for comparative purposes can be obtained from blood, semen, hair roots, skin, and indeed from over 99% of the cells of the human body.
"The immediate advantage of DNA fingerprinting . . . is the claimed certainty of identification . . . The laboratory the People propose to utilize claims a mean power of certainty of identification for American Whites of 1 in 840,000,000, for American Black, 1 in 1.4 billion." (Citations omitted; footnotes omitted.) Id., 644.
The use of DNA fingerprinting has also been recognized as extremely effective in proving paternity. W.C. Thompson S. Ford, "DNA Acceptance and Weight of the New Genetic Identification Tests," 75 Va.L.Rev. 45, 61 n. 76 (April 1989). Following a Newsweek account that "DNA prints" yield a "certainty" rather than a "possibility of paternity," the American Bar Association Journal reported that "[i]n the family law area, it means a woman suing for paternity can establish CT Page 12586 conclusively whether the respondent is the father." Moss, DNA — The New Fingerprints, A.B.A., May 1, 1988 at 66. When both parents of the child are tested, the possibility of paternity, as expressed in a percentage, will either approach one hundred percent or zero percent. See J.E. Cullins, Jr., supra, 1719.
When one parent is unavailable, as in the present case, DNA fingerprinting may also be utilized to effectively establish a "probability" of paternity by testing relatives of the unavailable parent. Id., 1714. The DNA "print" of a father, mother, or other relative of the deceased putative father can be compared to the DNA prints of the child and the available mother to determine whether the parties are related. Although the process can not be deemed conclusive, it has been recognized by the scientific community as quite valuable. Paternity Testing: Blood Group Systems and DNA Analysis by Variable Number of Tandem Repeat Markers, Journal of Forensic Sciences, Vol. 35, No. 5, Sept 1990, pp. 1217-25. In one abstract, both the alleged father and his first wife were deceased. "DNA prints" from his second wife and her four children were compared with the "DNA print" of the child who was trying to establish paternity. The high probability of paternity (0.9999987) led the scientists to conclude that the man probably was the actual father. Id.
Furthermore, other courts, including one state Supreme Court has recognized the reliability of testing relatives for purposes of establishing paternity. InSudwischer v. Estate of Hoffpauir, 589 So.2d 474 (La. 1991), cert. denied sub nom, Estate of Hoffpauir v.Sudwischer, 112 S.Ct. 1937, 118 L.Ed.2d 543 (1992), the Supreme Court of Louisiana affirmed an order that the legitimate daughter of a deceased father provide a blood test to determine the paternity of an illegitimate daughter. The court reasoned that the DNA fingerprinting of the legitimate daughter would produce relevant evidence which could establish the probability of a relationship between the deceased legitimate daughter and the illegitimate daughter. Id., 475. The DNA expert testified that the probability of the relationship could be as low as one in five or as high as one in a hundred thousand. Id. See also, In re EstateCT Page 12587of Rogers, 583 A.2d 782, 783-84 (N.Y. Super.Ct.App. Div. 199 0) (ordering nonparty ex-wife and four children of the decedent born during their marriage who were parties, to submit to blood tests). But see, WilliamM. v. Superior Court, 275 Cal.Rptr. 103 (Cal.App. 3 Dist. 1990) (court lacked jurisdiction to order putative grandparents tested): and Estate of Sanders Laurel S.v. Sanders, 2 Cal.App.4th 462, 3 Cal.Rptr.2d 536
(1992) (court lacked jurisdiction to order genetic testing of legitimate children).
In Tipps v. Metropolitan Life Insurance Company,768 F. Sup. 577 (U.S. Dist. Ct., S.D. Tex., May 14, 1991), thirteen year old Lori Kiser sought to prove that Carl Kiser, then deceased, was her biological father so that she could share in his life insurance proceeds. The court acknowledged that prior to the development of accurate, scientific paternity testing, the presumption of Carl's paternity would easily have been sustained based solely on the testimony and evidence offered by the lay witnesses. Id., 579. However, the court relied on DNA comparison tests of Carl's parents, Carl's legitimate son, and Lori to determine that Carl was not Lori's father. The DNA expert testified that "based on her professional knowledge and experience in the field of genetic testing, the test results were at least 95% and probably 99% conclusive." Id., 578.
"DNA fingerprinting can establish paternity even when the putative father is deceased because DNA testing uses molecules that remain stable and testable long after death . . . [I]f samples of the putative father's DNA are unavailable, it may be possible to reconstruct his DNA fingerprint by using samples from close relatives . . . Thus, DNA testing provides, for the first time, the potential for accurate posthumous paternity identification." C.N. Le Ray, supra, 35 B.C.L. Rev. 764-65 (1994). "[F]ormaldehyde preservation, common in embalming, appears to reduce testing accuracy . . . Tests on exhumed males may fail to exclude up to 40% of the population, due to the degraded condition of most corpses . . . Cellmark Diagnostics does not perform tests on embalmed tissue due to problems caused by formaldehyde . . . Lifecodes Corporation CT Page 12588 estimates that its . . . testing is successful in only20-25% of exhumation cases." Id., 765 n. 114.
When faced with the questions of using DNA testing of deceased putative father's genetic material to determine paternity some courts have permitted the exhumation of a deceased putative father for the purpose of conducting DNA tests to establish paternity. SeeBatcheldor v. Boyd, 423 S.E.2d 810 (N.C.App. 1992), cert. denied, 426 S.E.2d 700 (1993) (corpse of the intestate alleged father was ordered exhumed, so that DNA tests could be performed, at the request of the deceased's alleged son); Alexander v. Alexander,537 N.E.2d 1310 (Ohio Probate Court 1988), dismissed as moot, 560 N.E.2d 1337, 1339 (1989) (after taking judicial notice of the accuracy of DNA tests, the court ordered the deceased putative father to be exhumed for purposes of DNA paternity test); and Hornbeck v.Simmons, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 705309, 12 CONN. L. RPTR. 417 (September 6, 1994) (O'Neill, J.) (ordered exhumation for purposes of DNA testing to establish paternity). But see, Estate of Janus, 600 N.Y.S.2d 416
(1993), affirmed, 620 N.Y.S.2d 342 (App.Div.Sup. Ct. 1994) (court denied exhumation of deceased putative father because there "may not be sufficient DNA material . . ."); and Le Ferve v. Sullivan, 785 F. Sup. 1402
(C.D. Cal. 1991) (DNA test results inadmissible under statute requiring open and notorious acknowledgement as the only means of establishing paternity).
General Statutes § 46b-168 allows the use of DNA tests to establish paternity. That statute, in pertinent part provides: "(a) In any proceeding in which the question of paternity is at issue the court . . . on motion of any party, may order genetic tests which shall mean deoxyribonucleic acid tests, to be performed by a hospital, accredited laboratory, qualified physician or other qualified person designated by the court, to determine whether or not the putative father or husband is the father of the child. The results of such tests shall be admissible in evidence to either establish definite exclusion of the putative father or husband or as evidence that he is the father of the child." General Statutes § 46b-168. CT Page 12589
"Principles of law which serve one generation well may, by reason of changing conditions, disserve a later one." Herald Publishing v. Bill, 142 Conn. 53, 62,111 A.2d 4 (1955). Since our Supreme Court decided [Hayes v. Smith, 194 Conn. 52, 480 A.2d 425 (1984)], a court faced with the question of paternity is no longer dependent upon fallible testimony. Through the remarkable advancements in genetic testing, science has virtually eliminated the "proof problem" by developing an effective means to prove the identity of an illegitimate child's father in the absence of the father. Our legislature has recognized these advancements by twice amending General Statutes § 46b-168 to provide for the new methods of genetic testing.
Furthermore, our cultural reality has changed. More and more children are being born out of wedlock. These "innocent offspring," [Heath v. White,5 Conn. 228, 234 (1824)], should not suffer the loss of property and the right to be supported by both parents simply because of the demise of the parents, or inaction by a birth mother in enforcing the property interests of her children against a putative father during his lifetime. No other legal representative of the illegitimate child is available, unless the child is a recipient of Aid to Families with Dependent Children (AFDC) and the state intervenes to force the mother to name the putative father for support enforcement purposes. General Statutes § 17-234 et seq.
While the child may suffer the loss of the parent because of death, there may be at least the hope of reconciliation with his or her extended family and what one would expect to be emotional support for that "innocent," but also the possibility of financial support to assist the child in the preparation for the future which is for our future.
In consideration of the scientific techniques available to determine paternity, this court will not deny Kaitlyn the right to prove her paternity so that she may equitably share in her father's estate. The plaintiff's motion for genetic testing is granted. The plaintiff, minor child, Patricia and Richard Welch are hereby CT Page 12590 ordered to submit to DNA testing. In addition, the court orders exhumation of the body of Michael Welch for purposes of conducting DNA testing. Although, as noted above, this testing may not conclusively establish Kaitlyn's paternity depending on the severity of decomposition, it is another alternative and reliable avenue for determination of the question of paternity. If paternity is established, this court retains jurisdiction over the question of the payment of the cost of exhumation in light of the grandparents' refusal to voluntarily submit to the minimal intrusion of a blood test.
CONCLUSION
For the foregoing reasons, the motion to cite in Patricia Welch as a party defendant is granted. The request to recognize Richard J. Welch in his individual capacity is also granted. The motion for genetic testing of Richard J. Welch, Patricia Welch, Shannon Lach and the minor child is granted. Additionally, this court orders the exhumation of the decedent's, Michael Welch, remains for purposes of DNA testing.
DRANGINIS, J.