**Cody CAMPBELL, a minor by Darlene CAMPBELL, his guardian, Plaintiff–Appellant,**

v.

**Kenneth S. APFEL,[1] Commissioner, Social Security Administration, Defendant–Appellee.**

No. 96–35285.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 16, 1998.

Decided May 25, 1999.

---

1. Kenneth S. Apfel is substituted for his predecessor, Shirley S. Chater, as Commissioner of the Social Security Administration. Fed. R.App. P. 43(c)(1).

Steven Gompertz, Arcata, California, for plaintiff-appellant.

Richard H. Wetmore, Acting Regional Chief Counsel, Office of General Counsel, Seattle, Washington, for defendant-appellee.

Before: ALDISERT,[2] WALLACE, and KOZINSKI, Circuit Judges.

Opinion by Judge WALLACE; Dissent by Judge ALDISERT.

WALLACE, Circuit Judge:

Cody Campbell appeals from a denial of benefits as an alleged surviving child of deceased wage earner Lowell E. Schmidt, under Title II of the Social Security Act (Act). 42 U.S.C. § 402(d). The district court exercised jurisdiction to review this case pursuant to 42 U.S.C. § 405(g), and affirmed the decision of the Commissioner of Social Security (Commissioner) denying Campbell's claim for benefits. Campbell timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm.

I

■ The district court's order upholding the Commissioner's denial of benefits is reviewed de novo. *Jamerson v. Chater,*

112 F.3d 1064, 1066 (9th Cir.1997) (*Jamerson*). The Commissioner's decision is upheld so long as it is free of legal error and supported by substantial evidence. *Smolen v. Chater,* 80 F.3d 1273, 1279 (9th Cir.1996).

Campbell was born on March 22, 1985, in Salem, Oregon, and has always resided in Oregon. His mother is LaRae Lopez, and his father is alleged to be Schmidt, even though no name is listed on the birth certificate as father.

In California, the Humboldt County District Attorney filed a proceeding on behalf of Campbell to determine paternity on August 12, 1985. Schmidt denied paternity, and a hearing was held in September 1986 to determine whether he should pay temporary child support. According to DNA evidence presented at this hearing, there was a 98.14 percent probability that Schmidt was Campbell's natural father. Nonetheless, the California court denied the request for temporary child support. No further proceedings were held, and all evidence shows that Schmidt continued to deny parentage until his death on June 9, 1990.

On September 18, 1991, Campbell filed a claim for Child's Insurance Benefits under the Act on the account of Schmidt. The claim was denied, and Campbell requested a hearing before an administrative law judge (ALJ). The ALJ also denied the claim, which became a final decision of the Commissioner when the Appeals Council denied Campbell's request for review. After the district court affirmed, this appeal was filed.

II

The Act provides benefits to the child of an insured wage earner if the child was dependent upon the wage earner at the time of death. 42 U.S.C. § 402(d)(1). A child whose parents were never married

2. Honorable Ruggero J. Aldisert, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

may establish dependency for the purpose of receiving benefits if during his life the insured either: (1) acknowledged paternity in writing, (2) was decreed by a court to be the parent, or (3) was ordered to contribute to the child's support due to his paternity. 20 C.F.R. § 404.355(c). Dependency may also be found if the insured had been living with the child or contributing to the child's support at the time of death. 42 U.S.C. § 402(d)(3). Campbell concedes that he does not qualify for benefits based on this statute and regulation.

■ In the alternative, to determine whether a claimant is the child of a deceased insured wage earner, the Commissioner is instructed to "apply such law as would be applied in determining the devolution of intestate personal property by the court of the State ... in which [the insured] was domiciled at the time of his death." *Id.* § 416(h)(2)(A). Schmidt died domiciled in California; thus, California intestacy laws govern whether Campbell may receive surviving child benefits.

Relevant to establishing a parental relationship for purposes of intestate succession, the California Probate Code, at the time of Schmidt's death, provided:

> [The parental] relationship may not be established by an action under ... the Civil Code unless either (A) a court order was entered during the father's lifetime declaring paternity or (B) paternity is established by clear and convincing evidence that the father has openly and notoriously held out the child as his own.

Cal. Prob.Code § 6408 (repealed); *see also* 20 C.F.R. § 404.354(b) (stating that the Commissioner will look to the laws in place at the time of the insured's death). Campbell concedes that he cannot establish a parent-child relationship based on the requirements of the California statute. He argues, however, that the requirement to apply California law refers to the whole law of California, including the conflict of laws principles that might point to application of Oregon intestacy laws.

Neither the district court nor the agency decisions made a specific determination regarding the conflict of laws argument presented by Campbell. Rather than deciding whether or not conflict of laws principles apply, the ALJ concluded that "[t]here is no showing that either the State of California or the State of Oregon would find that a parental relationship existed based on the record." The district court also avoided the conflict of laws issue by assuming without deciding that Oregon law applies, and it concluded that Campbell still would not recover insurance benefits.

We hold that application of 42 U.S.C. § 416(h)(2)(A) in determining parental status for purposes of receiving social security benefits does not entail complex conflict of laws analysis. Rather, determining parental status is as simple as it appears to be on the face of the statute—we must merely look to the *intestacy laws* of the state "in which [the insured] was domiciled at the time of his death," 42 U.S.C. § 416(h)(2)(A), in this case, California.

This holding comports with the relevant regulations interpreting the statute, which read in part:

> You may be eligible for benefits as the insured's natural child if ... [y]ou could inherit the insured's personal property as his or her natural child under State *inheritance laws* as described in § 404.354.

20 C.F.R. § 404.355(a) (emphasis added). The cross-referenced regulation, 20 C.F.R. § 404.354(b), reads:

> *Use of State laws.* To decide your relationship to the insured, ... [i]f the insured is deceased we look to the laws that were in effect at the time the insured worker died in the State where the insured had his or her permanent home.

Applying the statute and regulations to the case at hand is straightforward. Schmidt died domiciled in California; thus, we must look to the "laws that were in effect [in

California] at the time [Schmidt] died." *Id.* These "laws" are the "State inheritance laws." 20 C.F.R. § 404.355(a).

The intent of the statute and regulations is not only clear, but logical. As indicated in the above regulation, the "we" who will "look to the [state] law" is a representative of the Commissioner. There is no requirement that this person be legally trained or have mastered the complex conflict of laws cases. It thus makes sense, as the statute clearly states, that the representatives of the Commissioner will look at the California law of intestate succession and make a ruling. That is what happened here.[3]

A subsequent event shows our interpretation is correct. On October 28, 1998, amendments were published in the Federal Register affecting these regulations. As these amendments did not become effective until November 27, 1998, they do not directly apply to this case. The language in the new regulations, however, does reinforce a construction of the statute that excludes conflict of laws analysis and further indicates that the view of the Commissioner in this regard has not changed.

Section 404.355(b) of the new regulations reads: "If the insured is deceased, we look to the laws of the State where the insured had his or her permanent home when he or she died." This language nearly mirrors the current regulations as quoted above. Furthermore, in the supplementary information to the new regulations it reads:

> When determining the relationship of a child born out of wedlock to a deceased insured person under section 216(h)(2)(A), we have always looked to the law that was in effect in the insured's State of domicile at the time he or she died.

63 Fed.Reg. 57,591 (1998).

■ ] It is well established that we defer to an agency's reasonable interpretation of its statutes and regulations. *Jamerson,* 112 F.3d at 1066; *see also Watson Land Co. v. Commissioner,* 799 F.2d 571, 579 (9th Cir.1986) ("[L]egislative regulations, if consistent with statutory authorization, adopted pursuant to proper procedure, and reasonable, have the force of law."). The agency has interpreted the state law to be applied as the state inheritance laws. As this is a reasonable interpretation of subsection 416(h)(2)(A) to which we owe deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 845, 104 S.Ct. 2778, 81 L.Ed.2d 694

---

**3.** The dissent argues that the Commissioner should have looked to California conflict-of-laws principles and applied a governmental interest analysis to determine whether California or Oregon's interest predominates. A conflict-of-laws/governmental interest approach is not only beyond the agency's expertise and contrary to its regulations, it is also such an inherently indeterminate and manipulable doctrine that it is unlikely to foster a predictable system for distributing social security benefits under these circumstances. *See generally* Stewart E. Sterk, *The Marginal Relevance of Choice of Law Theory,* 142 U. Penn. L.Rev. 949 (1994). The dissent believes that California courts would find that Oregon's interest here predominates over California's, but one could easily reach the opposite conclusion. California courts might well decide that California's interest in upholding its system of intestate succession outweighs Oregon's interest in having children such a Cody Campbell inherit from a California decedent's estate. A California child in Campbell's posi-

tion would not be entitled to any assets of the decedent's estate, and nothing in California case law suggests that the courts would treat Campbell more favorably just because he lives out of state. California's policy is to exclude children like Campbell who have not met its requirements for establishing the decedent's paternity, and there is no reason to believe that California courts would give less weight to this policy merely because an out-of-state child is involved. We disagree with the dissent that the proper test is how California would dispose of social security benefits, over which it has no authority and, hence, no legitimate interest of any sort.

Ultimately, the approach suggested by the dissent suffers from the ubiquitous flaw in all governmental interest analyses: it offers no general principles to assist our determination of which state has the more compelling interest, and we are left with only our personal predilections as a guide. This is hardly the kind of decision that can be routinely made by administrative law judges.

(1984), the regulations implementing this interpretation are controlling.

Campbell nevertheless argues that such a construction of the statute conflicts with *Moorehead v. Bowen,* 784 F.2d 978 (9th Cir.1986) (*Moorehead*). *Moorehead* relies on *Wickware v. Session,* 538 S.W.2d 466, 470 (Tex.Civ.App.1976) (*Wickware*), for its outcome. To understand *Moorehead, Wickware* needs to be analyzed.

In *Wickware,* two children were born in California out of wedlock. Subsequent to an acknowledgment of paternity, a suit was filed in the California state court resulting in legitimation pursuant to California law. After the father's death, a suit was filed in Texas state court to secure the father's property. The issue was whether the Texas court should give full faith and credit to the California judgment and, in doing so, apply conflict of laws analysis. Texas intestacy law did not become relevant to this inquiry.

Though the court in *Moorehead* made passing reference to the regulations at issue in this case, *see Moorehead,* 784 F.2d at 979 n. 1, it did not address the reasonableness of those regulations for purposes of *Chevron.* Indeed, the regulations are absent from *Moorehead*'s analysis and serve no purpose to the holding. *Moorehead* merely interpreted *Wickware* to require courts to look to Texas conflict-of-laws principles to determine the legitimacy of a child living outside of Texas. Because the reasonableness of the regulations was not before it, the court had no occasion to address, as we do here, whether the agency's regulations require the Commissioner to look only to the intestacy laws of the state of the decedent to determine a child's legitimacy, and whether that requirement meets the *Chevron* standard. Thus, as it interprets Texas conflict-of-laws principles only, *Moorehead* is not relevant to the issues before us.

## III

■ As previously stated, Campbell concedes that he cannot meet the require-

ments of the relevant California statute. Thus, he asks us to ignore Supreme Court precedent and hold that statutes such as this violate the equal protection clause of the Constitution. In *Lalli v. Lalli,* 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978), the Supreme Court upheld a similar, but even more restrictive, New York statute.

Following the Supreme Court's decision in *Lalli,* the California Court of Appeal upheld a constitutional challenge to section 6408. *Estate of Sanders,* 2 Cal.App.4th 462, 3 Cal.Rptr.2d 536 (1992). Campbell correctly points out that we are not bound by the state court decision. However, the state court's analysis is correct. Relying on *Lalli,* the state court properly held that, "requiring a court order establishing paternity to be issued during the father's lifetime is substantially related to the state interest the statute was intended to promote." *Id.* at 545, 2 Cal.App.4th 462.

AFFIRMED.

ALDISERT, Circuit Judge, dissenting:

The majority and I view this case through different lenses. In this Social Security entitlement case in which the deceased putative father had been domiciled in California and the child claimant is from Oregon, I believe that the provisions of 42 U.S.C. § 416(h)(2)(A) require the Commissioner and a reviewing court to make a choice of law analysis to determine whether the laws of California or Oregon govern the grant of Child's Insurance Benefits under Title 11 of the Social Security Act, 42 U.S.C. § 402(d). Applying this analysis I would hold that the law of Oregon, and not California, should apply.

The outcome of this case rests on the interpretation to be given to 42 U.S.C. § 416(h)(2)(A). The majority holds that this statute merely directs the Commissioner of Social Security to apply the intestacy law of the state in which a decedent was domiciled at the time of his death. I construe the statute as directing the Com-

missioner, in cases in which the decedent and his putative child were domiciled in different states, to apply the whole law of the state where the decedent father was domiciled, including its choice of law precepts. Because application of California choice of law principles would result in the application of Oregon's substantive law regarding intestate succession, I would reverse the holding of the district court and remand the case to the Commissioner with instructions that he award social security insurance benefits to the Appellant.

The centerpiece of the majority's approach is the statement:

> We hold that application of 42 U.S.C. § 416(h)(2)(A) in determining parental status for purposes of receiving social security benefits does not entail complex conflict of laws analysis. Rather, determining parental status is as simple as it appears to be on the face of the statute-we must merely look to the *intestacy laws* of the state "in which [the insured] was domiciled at the time of his death," 42 U.S.C. § 416(h)(2)(A), in this case, California.

Maj. Op. at ——.

For openers, I suggest that the majority's description of the application of § 416(h)(2)(A) flies in the face of the teachings of *Moorehead v. Bowen,* 784 F.2d 978 (9th Cir.1986), in which this court in a Social Security case that is identical to the case at bar-except that the child was in California and the putative father was a Texas domiciliary-applied Texas choice of law analysis. Thus, a previous panel of this court has held that the Commissioner of Social Security is required to make a choice of law analysis. The majority ignores this.

In *Moorehead* we determined:

> To the extent that the differing formalities required by California and Texas law reflect different attitudes about the desirability of legitimating children, the Texas courts would agree that California has the greatest interest in the transac-

tion because of the presence of both parents and child in California during Jibri's conception, birth and putative legitimation, and the continued residence of the mother and child in California afterwards. *See Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 420–21 (Tex.1984) (adopting most significant contacts test.).

784 F.2d at 983. Had the *Moorehead* panel followed the course proposed by the majority here, it simply would have applied Texas intestacy law because the father was domiciled there at the time of his death. That the court in *Moorehead* chose to apply California intestacy law after employing Texas choice of law principles convinces me that this court's jurisprudence runs counter to the majority's approach to this case. Yet, I need not rely on a single precedent to support my contention that a choice of law analysis is required, and that applying California's government interest test the law of Oregon should govern the child's Social Security claim.

I.

It is undisputed that the decedent, the putative father, was a domiciliary of California at the time of his death, and that the child was a domiciliary of Oregon at all times relevant to this proceeding. The child has conceded that he can receive Social Security insurance benefits in this case only under § 416(h)(2)(A).

In relevant part, section 416(h)(2)(A) provides:

> In determining whether an applicant is the child or parent of a fully or currently insured individual for purposes of this subchapter, the Commissioner of Social Security shall apply such law as would be applied in determining the devolution of intestate personal property by the courts of the State in which such insured individual is domiciled at the time such applicant files application, or, if such insured individual is dead, by the courts of the State in which he was domiciled at the time of his death. . . .

42 U.S.C. § 416(h)(2)(A). This section makes clear that the Appellant is entitled to benefits only if he could inherit from the decedent under the law applied by California courts.

It is at this point that I part company from the majority. The majority has assumed that the courts of California would automatically apply California intestacy law. Thus, the majority essentially holds that § 416(h)(2)(A) acts as a kind of federal "choice of law provision" that directs the Commissioner automatically to apply the intestacy law of the state of the decedent's domicile. The concept of a federal choice of law implied by statute was rejected by the Supreme Court, in an analogous context, in *Richards v. United States*, 369 U.S. 1, 13, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

Consistent with the teachings of *Moorehead*, I do not believe that the statute prescribes the result espoused by the majority. Section 416(h)(2)(A) contemplates the analysis that would be conducted by courts attempting to distribute intestate personal property. To hold that § 416(h)(2)(A) directs the Commissioner to apply California's intestacy law is to misread the statute. The statute states: "[T]he Commissioner of Social Security shall apply *such law as would be applied in determining* devolution of intestate personal property by the courts of the State in which such insured individual ... was domiciled at the time of his death." 42 U.S.C. § 416(h)(2)(A) (emphasis added). The majority's holding incorrectly transforms the language of § 416(h)(2)(A) to read, "[T]he Commissioner of Social Security shall apply *the law* of devolution of intestate personal property of the State in which such insured individual was domiciled at the time of his death."

The statute speaks in terms of "such law as would be applied." It therefore requires us to examine the phrase "such law" from both philosophical aspects of, "What is law?" and explicit teachings of our jurisprudence. Our starting point has to be Oliver Wendell Holmes' familiar expression: "The prophecies of what the courts will do in fact and nothing more pretentious, are what I mean by the law."[1] Professor Harry W. Jones, the late Cardozo Professor of Jurisprudence at Columbia, once wrote: "Law is not a form of art for art's sake; its ends in view are social, nothing more and nothing less than the establishment of a social environment in which the quality of human life can be spirited, improving and unimpaired."[2] Cardozo, himself, hesitated in formulating a definition, and was content to suggest that "[w]hat really matters is this, that the judge is under a duty, within the limits of his power of innovation, to maintain a relation between law and morals, between the precepts of jurisprudence and those of reason and good conscience."[3]

Perhaps Roscoe Pound furnished the most comprehensive formula:

> These three elements that make up the whole of what we call law are: (1) a number of legal precepts more or less defined, the element to which Bentham referred when he said that law was an aggregate of laws; (2) a body of traditional ideas as to how legal precepts should be interpreted and applied and causes decided, and a traditional technique of developing and applying legal precepts whereby these precepts are eked out, extended, restricted, and adapted to the exigencies of the administration of justice; (3) a body of philosophical, political, and ethical ideas as to the end of law, and as to what legal precepts should be in view thereof, held consciously or subconsciously, with ref-

---

**1.** Oliver Wendell Holmes, *The Path of the Law*, 10 Harv. L.Rev. 457, 461 (1897).

**2.** Harry W. Jones, *An Invitation to Jurisprudence*, 74 Colum. L.Rev. 1023, 1025 (1974).

**3.** Benjamin N. Cardozo, The Nature of the Judicial Process 133–134 (1921).

erence to which legal precepts and the traditional ideas of application and decision and the traditional technique are continually reshaped and given new content or new application.[4]

From these giants of the American legal tradition we discern the appropriate instruction in deciding what is meant by "such law" in the statute. We must determine whether the Commissioner of Social Security-charged with administering a legislative program that seeks to establish a social environment, in Professor Jones' formulation, in which the quality of human life can be spirited, improving and unimpaired-recognized the spirit of these pronouncements.

These are the stark, absolute and irrefragable facts that faced the Commissioner: A child who is claiming Child Insurance Benefits was born in Oregon and lived all his life there. The Oregon mother who raised him is now dead. His putative father, a resident of California, is also dead. During his lifetime, the putative father admitted to having sexual relations with the child's mother during the appropriate period of the child's gestation; scientific blood tests of the putative father proclaim that there is a 98.14% probability that he was the child's father. The Commissioner denied Social Security benefits to the child on the basis that California law would not permit him to inherit from his father, even though Oregon law would. We have to decide whether the Commissioner has properly struck the balance between the precepts of jurisprudence and those of reason and good conscience, or whether she is protecting the public fisc by quibbling; thus *subjecting her to what Time Magazine* once described as a "ringing indictment of all the proud and cautious pettifoggers who can agree only on what cannot be done." [5]

In examining the relevant governing case law, I am persuaded that the Su-

preme Court has paid fealty to the masters of the American legal tradition in the philosophical concepts that underpin its jurisprudence; a jurisprudence asserting that when considering "the law" of a particular jurisdiction, a court must include the whole law of a state and not merely its internal law, and that choice of law precepts are invariably considered a central and integral part of a state's whole law.

The Supreme Court has crystallized this principle in the federal context. Addressing the precise question presented here-whether choice of law precepts should be considered as an integral part of "law" when expressed in a federal statute-the Court held that the word "law" should be interpreted broadly in interpreting the Federal Tort Claims Act provision directing courts to apply "the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b). *See Richards,* 369 U.S. at 11–13, 82 S.Ct. 585. In *Richards,* the Court held that a federal district court should apply "the whole law of a state," including the state's "choice of law rules," in a Federal Tort Claims Act suit in which negligence occurs in one state and results in injury and death in another state. *See id.* at 15, 82 S.Ct. 585. There, the Court was faced with the precise question that divides this panel: "[W]e must now determine the reach of the words 'law of the place.' Do they embrace the whole law of the place where the negligence occurred, or only the internal law of that place?" *Id.* at 10, 82 S.Ct. 585. It answered the question unequivocally: "Thus, we conclude that a reading of the statute as a whole, with due regard to its purpose, requires application of the whole law of the State where the act or omission occurred," which includes "the general conflicts rules in order to take into account the interest of the State having significant contact with the parties to the litigation." *Id.* at 11–12, 82 S.Ct. 585.

4. Roscoe Pound, *The Theory of Judicial Decision,* 36 Harv. L.Rev. 641, 645 (1923).

5. *See* Webster's Third New International Dictionary 1691 (1968).

In making its determination that the whole law, including conflict-of-law rules, should be applied, the Court noted that the statute's legislative history did not address the conflict-of-law issue, and stated:

> We believe it fundamental that a section of a statute should not be read in isolation from the context of the whole Act, and that in fulfilling our responsibility in interpreting legislation, "we must not be guided by a single sentence or member of a sentence, but (should) look to the provisions of the whole law, and to its object and policy." We should not assume that Congress intended to set the courts completely adrift from state law with regard to questions for which it has not provided a specific and definite answer in an act such as the one before us which, as we have indicated, is so intimately related to state law. Thus, we conclude that a reading of the statute as a whole, with due regard to its purpose, requires application of the whole law of the State where the act or omission occurred.

*Id.* at 11, 82 S.Ct. 585 (quoting *Mastro Plastics Corp. v. National Labor Relations Board,* 350 U.S. 270, 285, 76 S.Ct. 349, 100 L.Ed. 309 (1956)) (footnotes omitted).

Additionally, the Court indicated that application of the whole law, rather than the internal law alone, would be consistent with the purpose of the Act-treating the United States as a private individual-by allowing each state to implement its own conflicts analysis. The Court would not assume that Congress had enacted any conflict-of-laws rule independent of the states in the absence of any legislative history or controlling statutory language in the Federal Tort Claims Act.

The Court's discussion in Richards is directly applicable to the case at bar. Like the Federal Tort Claims Act, the statute here, § 416(h)(2)(A), contains no explicit statutory language addressing the conflict-of-law question. As with the Federal Tort Claims Act, no legislative history regarding the conflict-of-law question exists for § 416(h)(2)(A). Further, § 416(h)(2)(A), like the Federal Tort Claims Act, specifically directs courts to apply state law. Because courts should not assume that Congress intended "to set the courts completely adrift from state law" in an act which "is so intimately related to state law," as § 416(h)(2)(A) is, this court should apply the whole law of the domicile of the insured individual to the question of legitimacy under § 416(h)(2)(A). *See Richards,* 369 U.S. at 11, 82 S.Ct. 585.

What brings me into conflict with the Commissioner then is obvious. The Commissioner would apply the "internal law" of California instead of "the whole law" as instructed by the Supreme Court in Richards.[6]

---

**6.** Nor may the Commissioner find support in the Social Security regulations in effect at the time or subsequently adopted because, as the majority correctly observes, these latter regulations were adopted after the events of the case at issue took place. It is significant that both the old and new regulations require an interpretation of "the *law* of the state where the insured had his or her permanent home when he or she died." 63 Fed.Reg. 57590, 57594 (1998) (amended version of 20 C.F.R. § 404.355(b)(4)) (emphasis added). It would seem that the expression "law of the state" in the regulation has to be interpreted congruent with the statutory language "such law [of the state] as would be applied." 42 U.S.C. § 416(h)(2)(A). I do not believe that a proper interpretation of the regulations avoids the necessity of resorting to choice of law precepts. Moreover, the supplementary information accompanying the new regulations repeatedly emphasizes in related concepts that where there is ambiguity in a statute or where selection of one of competing statutes may become necessary, the Social Security Administration will apply "whichever version is more beneficial to the child." *See* 63 Fed. Reg. 57590, 57591 (1998) (to be codified at 20 C.F.R. pt. 404); *see also id.* at 57593–57594 ("We will apply whichever version of State law that is most beneficial to you"); *id.* at 57594 ("We will apply whichever version is most beneficial to you."). Conversely, should the Commissioner construe the regulations as not to require a choice of law analysis, although we generally afford deference to an agency's construction of a statute, we "may invalidate an agency regulation if it 'is not

## II.

Applying the whole law of California, we should employ the "governmental interest" approach to resolve choice of law questions. *See Hurtado v. Superior Court,* 11 Cal.3d 574, 579–580, 114 Cal.Rptr. 106, 522 P.2d 666 (1974); *Sommer v. Gabor,* 40 Cal.App.4th 1455, 1467, 48 Cal.Rptr.2d 235 (1995). Governmental interest analysis proceeds in three steps:

(1) determination of whether the potentially concerned states have different laws, (2) consideration of whether each of the states has an interest in having its law applied to the case, and (3) if the laws are different and each has an interest in having its law applied (a "true" conflict), selection of which state's law to apply by determining which state's interests would be more impaired if its policy were subordinated to the policy of the other state.

*North Am. Asbestos Corp. v. Superior Court,* 180 Cal.App.3d 902, 905, 225 Cal. Rptr. 877 (1986). Applying the governmental interest analysis, Oregon law should apply because: (1) California and Oregon have different laws, (2) each state has an interest in having its laws applied and (3) Oregon's interest would be more impaired than California's if its law were not applied.

### A.

California and Oregon have different laws. Thus, the first prong of the analysis is met. If the California Probate Code is applied to this case, it is clear that the Appellant cannot recover social security insurance benefits. Pursuant to California Probate Code ·§ 6453, paternity can be established if: (1) there is a presumed parent and child relationship pursuant to the Uniform Parentage Act, California Family Code § 7611, (2) a court order was entered during the father's lifetime declaring paternity, (3) there is clear and convincing evidence that the father held the child out as his own or (4) it was impossible for the father to hold the child out as his own and paternity is established by clear and convincing evidence. None of these conditions have been met; thus, the Appellant would not be entitled to inherit property from the decedent under California intestacy law.

If Oregon intestacy law is applied, however, the Appellant would be entitled to inherit from the decedent. Oregon law permits intestate succession from a father to his illegitimate child if paternity is established during the child's lifetime by filiation proceedings or by "other provision of law." *See* Or.Rev.Stat. §§ 112.105(2)(a), 109.070(*l*)(d), (g). To prove paternity, the Appellant would have to produce corroborating evidence, in addition to testimony that was provided by his mother, LaRae Lopez, at a January 7, 1994 administrative hearing, and establish the decedent's paternity by a preponderance of the evidence. *See* Or.Rev.Stat. § 109.155(*l*), (2). Corroborating evidence is "some substantial fact or circumstance which, indepen-

reasonably related to the purposes of the statute it seeks to implement,' [*Figueroa v. Sunn,* 884 F.2d 1290, 1293 (9th Cir.1989)], or if legislative history reveals a clear expression of congressional intent that runs contrary to the regulation." *Vierra v. Rubin,* 915 F.2d 1372, 1376 (9th Cir.1990).

This, too, must be said. The majority seems to infer that these particular Social Security regulations describing the statutory phrase "such law" are "legislative rules," and cites the Internal Revenue Service case of *Watson Land Co. v. Commissioner,* 799 F.2d 571, 579 (9th Cir.1986). I'm not so sure. As Professor Davis has explained, "A legislative rule is the

product of the exercise of delegated legislative power to make law through rules. An interpretive rule is any rule an agency issues without exercising delegated legislative power to make law through rules." 2 K.C. Davis, Administrative Law Treatise, § 7:8 at 36–37 (1979); *see also Multnomah Legal Services Workers Union v. Legal Services Corp.,* 936 F.2d 1547, 1554 (9th Cir.1991) (discussing distinction between legislative (substantive) and interpretive rules). For a description of the standards of review of these two forms of regulations, see *Buczynski v. General Motors Corp.,* 616 F.2d 1238, 1242–1243 (3d Cir. 1980).

dent of the [mother's] testimony, tends to connect the [decedent] with fatherhood of the child." *State ex rel. Farrer v. McGuire*, 14 Or.App. 446, 513 P.2d 816, 817 (1973).

Here, there is sufficient corroborating evidence that would permit the Appellant to establish the decedent's paternity under Oregon law. At a 1986 temporary support hearing, the decedent admitted to having sexual intercourse with Lopez during the period of conception, but claimed that Lopez was sleeping with other men during the same time period. Moreover, blood test evidence revealed a 98.14% probability that the decedent was the Appellant's father. This is corroborating evidence that is sufficient to establish the decedent's paternity. *See, eg., Thom v. Bailey*, 257 Or. 572, 481 P.2d 355, 356–358 (1971) (*in banc*) (man's admissions that he had sexual intercourse with woman during period of conception, combined with lack of evidence that she had sexual relations with other men during that time, sufficient corroboration even though man was found, four years after date of intercourse, to be sterile); *Jordan v. Rask*, 66 Or.App. 720, 674 P.2d 1211, 1212 (1984) (finding that man's admission of having sexual intercourse with woman during period of conception along with blood test establishing 93.5% probability of paternity "provide[d] independent corroboration to connect respondent with fatherhood of the child").

### B.

California and Oregon have an interest in having their law applied. The purpose of California Probate Code § 6453 is to "provide for the just and orderly disposition of a decedent's property in cases involving paternity claims, which present difficult problems of proof when the father is no longer alive." *In re Estate of Sanders*, 2 Cal.App.4th 462, 476, 3 Cal.Rptr.2d 536 (1992) (discussing version of statute that preceded § 6453). This interest would be furthered by application of California law because the decedent's property could be disposed of more quickly if the Appellant were required to prove paternity only by those means set forth in § 6453, which Appellant conceded he could not.

Oregon's corroboration and preponderance of the evidence standards, set forth in Or.Rev.Stat. § 109.155, are aimed at conferring the same rights on illegitimate children as other children. *Thom*, 481 P.2d at 359. This interest would be furthered by application of Oregon law in this case because the Appellant, who has been shown by a preponderance of the evidence to be the decedent's child, would receive the same status as he would have attained had he been the decedent's legitimate child.

### C.

Oregon's interest would be more impaired than California if its law were not applied. Because California and Oregon have an interest in having their law applied, California courts would perform a "comparative impairment" analysis to determine which law to apply. *See Bernhard v. Harrah's Club*, 16 Cal.3d 313, 320, 128 Cal.Rptr. 215, 546 P.2d 719 (1976). California courts would determine that Oregon's interest would be severely impaired if its law were not applied here.

If Oregon law is not applied, the child will not receive the same legal status as if he were the decedent's legitimate child, even though the blood test evidence suggests with a very high degree of probability that the Appellant is the decedent's child. Thus, application of California law will thwart Oregon's interest in providing equal treatment to legitimate and illegitimate children.

Conversely, California's interest in the just and orderly disposition of assets and the alleviation of problems surrounding proof of paternity will be impaired only slightly if its law is not applied. The decedent's paternity has already been established by a preponderance of the evidence, and there is no reason to believe that making a paternity determination

would have caused significant delay in the just and orderly disposition of this decedent's property. In fact, California's stated interests are less likely to be impaired in a situation such as the one presented here, in which the Appellant seeks social security insurance benefits paid out by the Government, rather than personal property that had belonged to the decedent. Any impairment to California's asserted interest by reason of application of Oregon law would certainly be *de minimis*. Oregon's intestacy law should be applied in this case, and the Appellant has proven that he is entitled to receive a portion of the decedent's social security insurance benefits.

### III.

The Commissioner committed reversible error in not applying the whole law here. She did not properly implement appropriate legal precepts. She did not properly apply the California choice of law analysis to determine the child's status for entitlement to social security insurance benefits, an analysis that would unerringly have led to a determination that Oregon law controlled, and that would have permitted the child to inherit from the decedent.

Therefore, I would reverse the judgment of the district court and remand these proceedings to the Commissioner with a direction to award benefits to the Appellant under the Child's Insurance Benefits under Title 11 of the Social Security Act, 42 U.S.C. § 402(d). Accordingly, I dissent.